(Decided 14th January, 1881.)

HENRY A. TURNER *vs.* THE STATE OF MARYLAND.

*Construction of the Tobacco Inspection Laws.*

The appellant was indicted for violating the Tobacco Inspection Laws, in that, being a grower of tobacco, he packed a certain quantity of such tobacco in a hogshead of unknown dimensions and exported it to Bremen, without having such hogshead of tobacco inspected and passed according to the laws of this State; and in that he did not pay the outage due the State on the tobacco thus exported.   On the demurrer of the appellant, it was HELD:

1st. That the Act of 1872, ch. 36, entitled, an Act to add a new Article to the Code of Public General Laws regulating the Inspection of Tobacco, which repealed all Acts or parts of Acts inconsistent with its provisions, did not modify or repeal sec. 41 of the Act of 1864, ch. 346, as modified by the Act of 1870, ch. 291, which constituted part of the Public Local Law; and that under that section it was the duty of the appellant to have delivered the tobacco

Turner *vs.* The State.

packed by him, to one of the State tobacco warehouses, in order that the inspectors might ascertain whether it was packed in hogsheads of the proper dimensions, and whether it was packed in the county or neighborhood where it was grown, and marked as the statute directed.

2nd. That the charge of outage was not in contravention of the Constitution of the United States, which prohibits any State from levying a tax on imports or exports, except so far as such tax may be absolutely necessary for the execution of its inspection laws.

3rd. That the appellant was liable to the fine imposed by the Court below, being the penalty prescribed by the Act of 1864, ch. 346, sec. 41.

APPEAL from the Criminal Court of Baltimore.

Henry A. Turner, a resident of Charles County in 1879, raised a crop of tobacco; of this crop he packed one hogshead, marked the same with his full name and place of residence and shipped it to Baltimore. On 31st August, 1880, this hogshead was exported by him to Bremen, never having been taken to the State tobacco warehouse. On 18th September, 1880, after presentment duly made by the Grand Jury in the Criminal Court of Baltimore, an indictment was found against him containing two counts, stated in the opinion of the Court.

To both of these counts demurrers were filed, on the 20th September, 1880, overruled by the Court, *pro forma,* and the traverser fined $300.

The case is brought to this Court by a petition in the nature of a writ of error.

The case was argued before BARTOL, C. J., MILLER, ROBINSON and IRVING, J.

*E. J. D. Cross* and *J. K. Cowen,* for the appellant.

1st. There is no law requiring a compulsory inspection of tobacco grown in this State, either by the producer who

may export it upon his own account, or by a purchaser who may buy for the purpose of exportation.

A grower of tobacco in this State, before exporting the same, is not required to take it to the State warehouse for any purpose whatever.

2nd. If this be not so, and a grower of tobacco, before exporting the same, is required to take it to the State warehouse for any other purpose than inspection, and is required to pay certain charges for "outage and storage," then such law is in contravention of the Constitution of the United States.

3rd. No penalty is imposed by any law upon a grower of tobacco who marks the same with his full name and residence, and exports it without taking it to the State warehouse or paying outage or storage.

1. The laws in force regulating the inspection of tobacco are those passed in the years 1872, ch. 36, 1874, ch. 394, and 1878, ch. 386.

The Act of 1872, ch. 36, was intended as a substitute for the Act of 1864, ch. 346, as is shown from a comparison of the two Acts.

It appears from such comparison, that the Act of 1872, ch. 36, was intended to systematize and embrace all the legislation upon the subject of the inspection of tobacco.

A close examination of the sections of the Act of 1872, compared with corresponding sections in the original Act of 1864, as amended by subsequent legislation, demonstrates that the former was intended as a substitute for the latter, and that it is impossible to hold that any of the provisions of the Act of 1864 are now in force.

The two laws cannot be in force, and the latter must necessarily repeal the former. *Montell vs. Consolidation Coal Co.,* 39 *Md.,* 164; *Stewart vs. Kahn,* 11 *Wallace,* 502; *The United States vs. Tynen,* 11 *Wallace,* 92; *Sacramento vs. Bird,* 15 *Cal.,* 294; *Swan vs. Buck,* 40 *Miss.,* 268; *Weeks vs. Walcott,* 15 *Gray,* 54; *Commonwealth vs. Kelliher,* 12 *Allen,* 480.

The Act of 1864, in terms, was part of Art. 4, Code of Public Local Laws, when the Act of 1872, ch. 36, entitled an Act to add a new Article to the Code of Public General Laws regulating the inspection of tobacco, was passed, and went off the statute book with its associates.

Section 41 of that Act, as amended by 1870, ch. 291, as sec. 535, Code of Public Local Laws, Art. 4, was the only section providing a penalty for exporting tobacco without inspection. It was the only then existing law forbidding the exportation of tobacco raised in this State, " except in hogsheads, which shall have been inspected, passed and marked agreeably to the provisions of this Act."

The inspection of tobacco grown in this State and exported therefrom, is therefore not compulsory, but voluntary.

The Act of 1872, ch. 36, imposes no penalty. Clearly, then, it was the legislative intent, and so must be construed, that inspection should be optional. No section of 1872, ch. 36, requires that tobacco raised in this State shall be brought to the State warehouses for any purposes whatever.

Section 41, of the Act of 1864, ch. 346, as amended by the Act of 1870, ch. 291, cannot be in force, because it imposed penalties for the doing of acts which are no longer unlawful under the Act of 1872, ch. 36, and required things be done which are now illegal. There is, therefore, no law requiring the compulsory inspection of Maryland grown tobacco, and there is no law prohibiting the exportation of such tobacco from the State without being inspected, passed or marked by State officials. The appellant, therefore, was not required by any law of this State, before exporting his tobacco, to bring the same to the State tobacco warehouses for any purpose whatever.

2. Supposing the Act of 1870, ch. 291, be held to be in force, and in no manner affected by the Act of 1872, it is

nevertheless in contravention of Art. 1, secs. 8 and 10, of the Constitution of the United States, so far as it compels growers of tobacco to pay outage and storage charges on tobacco that is not required to be inspected before exporting the same from the State.  We admit that the States may pass proper *inspection laws,* and that such laws may in effect amount to partial regulations of foreign or interstate commerce, or may impose such export duties or imposts as are absolutely necessary to enforce such inspection statutes; but the Act of 1870 levies a duty upon exports and it regulates foreign commerce, and it is not valid as an inspection law.  In this case the appellant has complied with the provisions of the law in regard to the marking of his hogshead.  He was a grower of tobacco in this State.  He packed his tobacco in the county and neighborhood where grown.  He marked his hogshead with his name in full, and the place of his residence, and when that was done the law expressly provided that the tobacco so grown and marked could be "exported or carried out of this State *without inspection,*" and likewise provided that while it could be carried out of the State without inspection, it was still subject to the "same charge of outage and storage as in other cases."  This law, therefore, expressly provided that the article in question should not be *inspected,* and after so providing, then required the uninspected article to pay an export duty in the shape of outage and storage.  How can such an Act be defended as an inspection law which provides on its very face that the article exported may be carried out of the State without inspection, provided it pays an outage and storage tax. *Clintsman vs. Northrop,* 8 *Cowan,* 45, 46; *State vs. Fosdick,* 21 *La. An.,* 256; *Bouvier's Law Dic.,* "*Inspection.*"

Attention is called to recent and important cases of the Supreme Court where, apparently, the necessary exercise of the police power by States has been held to fall within the inhibition of the Constitution.  A State

Turner *vs.* The State.

cannot, either by its powers of self-defence in matters of police, or by the reserved power of passing reasonable and adequate inspection laws, impose any burden on commerce. *The Cherokee Cattle Cases,* 95 *United States,* 468, 472; *Henderson vs. Mayor, &c., of New York,* 92 *Id.,* 259; *Chy Lung vs. Freeman, et al.,* 92 *Id.,* 275.

Even discrimination in rates of wharfage at a city wharf, falls under this prohibition. *Guy vs. Baltimore,* 100 *United States,* 434.

3. The judgment of the Court below imposing the fine, must in any event be reversed. The penalty referred to in the proviso of section 41 of the Act of 1864, only applies to " any person who shall carry or send out of this State any such tobacco without having it so marked." That is, without having such hogshead marked with the name in full of the owner and the place of his residence. The indictment shows that the hogshead exported by the appellant was " so marked," and hence the appellant could not be subject to the penalty prescribed by section 41. All that he can be required to do is to pay the outage charge, for the non-payment of which no penalty is prescribed by the Act of 1864, or the Act of 1870. The claim, therefore, of the State would be for a simple debt, and that debt can only be recovered in a civil action.

*Charles J. M. Gwinn, Attorney-General,* for the appellee.

Under the system established by the Public Local Act of 1864, ch. 346, it was unlawful to carry out of the State, in hogsheads, any tobacco raised in the State, except in hogsheads which had been inspected, passed and marked in accordance with the provisions of that Act. The Act required the inspection of the form of each hogshead, as well as its contents. No tobacco was lawful tobacco unless packed in a hogshead of certain prescribed dimensions, to be determined by the inspection of its exterior. No tobacco was merchantable tobacco unless determined

to be so by sampling the contents of such hogshead. When the form of the hogshead had been examined, and found to be of the prescribed description, and the full hogshead had been weighed and its gross weight marked and recorded, and when, afterwards, its contents had been sampled, the hogshead was *"passed."*

When the Act of 1864, ch. 346, was amended by the Act of 1870, ch. 291, a different state of things arose. The grower, or purchaser of tobacco, grown in the county where it was packed, was allowed to carry such tobacco out of the State, or to export it, *without having it opened for inspection,* provided such tobacco was marked with his name and place of residence. But, under the Act of 1870, ch. 291, the tobacco remained liable to the charge of outage and storage as in other cases.

Tobacco, therefore, grown in the county where it was packed, was freed only from those requirements of the Act of 1864, ch. 346, *which were incident to the opening of the hogshead,*—that is to say, from sampling, re-staying and re-conditioning. It remained subject to the requirement that the hogshead containing it should not exceed the prescribed statutory dimensions, and that its gross weight should be ascertained, and that it should be actually *"passed"* by the inspector and duly marked with its gross weight. For the particular exception, accorded to such tobacco in the earlier words in the proviso to the Act of 1870, ch. 291, from the requirements imposed upon it by the Act of 1864, ch. 346, were not enlarged by the words, "but such tobacco, *so* exported, or carried out of this State *without inspection,* shall, &c." The use of the words "*so* carried out of the State, without inspection," clearly shows that the meaning of the Legislature was—carried out of the State without *such* inspection—that is to say, without opening the hogshead for inspection. This is not only the obvious construction of the language used, but it is a construction which is required by the rules of

law governing the interpretation of statutes. The intent was particular, and the words, "so carried out of the State without inspection," must be construed to refer only to the absence of the particular inspection from which such tobacco was released. *Stradling vs. Morgan*, 1 *Plowd.*, 204; *Hawbecker vs. Hawbecker*, 43 *Md.*, 519; *Maxwell on Inter. of Stat.*, ch. 2 *and* ch. 3. For where general words follow particular words it is a rule that such general words must be construed as applicable to the things or persons before particularly mentioned. *Sandiman vs. Breach*, 7 *Barn. & Cress.*, 100 ; *Sedg. on Const. of Stats.*, 2nd *Ed.*, 361. The general words are restrained by the words to which they relate. *U. S. vs. Fisher*, 2 *Cranch S. C.*, 386, 387, MARSHALL, C. J.

In 1872, while all the provisions of the Act of 1864, ch. 346, were in force, the Legislature passed "an Act to add a new Article to the Code of Public General Laws, regulating the inspection of tobacco." 1872, ch. 36.

The whole system of laws in relation to this subject had been provided for in 1864, as it had been in 1860, by Public Local Laws, embodied in that part of the Local Code which related to the City of Baltimore.

The new Article contained no reference to such preceding legislation. It simply made the particular provisions, which are contained in its text, and concluded, (sec. 33,) by repealing only all laws, or parts of laws, inconsistent with that Act and the provisions therein contained.

The first question to be determined, is whether the Legislature in enacting this new law, intended to revise the whole subject-matter of its legislation in reference to "Tobacco," and to enact a substitute for all existing General and Local Laws upon the particular subject. *Montell vs. Consolidation Coal Company*, 39 *Md.*, 171, 172. The new Public General Act not only lacks the expression of any purpose to repeal wholly a prior Public Local Act, and confines, in terms, its repealing operation to such

parts of the local law as are inconsistent with its provisions, but is also so expressed as to make it necessary to refer to the prior local law, in order to give completeness to the system of which the new law is a part. Under such circumstances the old and the new provisions must be so construed that they may stand together. *Montell vs. Consolidation Coal Company*, 39 *Md.*, 169.

That this insurmountable presumption exists in the case of the Act of 1872, ch. 36, is plain from its text.

The new Act changed the measurement of the maximum hogshead, in which tobacco should be packed, by prescribing that it should not exceed fifty-four inches in the length of the staves, no. forty-six inches across the head. It provided that no tobacco of the growth of the State should be passed "*or accounted lawful tobacco*," unless the same was packed in hogsheads not exceeding these measurements; and that the owner of tobacco, packed in any hogshead of greater dimensions, or his agent, should repack the same in hogsheads of the prescribed size, at his own expense, before the same should be passed. 1872, ch. 36, sec. 26. It did not provide that each hogshead of tobacco should be numbered as it was received, and such number entered in a book with the date of its receipt; 1864, ch. 346, sec. 10; or that such hogshead should be weighed before it was encased, and the separate weights of the hogshead and tobacco ascertained; 1864, ch. 346, sec. 13; nor did it authorize, or require, the inspector to uncase the tobacco; 1864, ch. 346, sec. 15; but it assuredly recognized the power and obligation of the inspector to perform these duties, *under some other law in existence*, when it provided that such hogshead should be marked with its number, and have the gross and net weight marked with iron on the bilge. 1872, ch. 36, sec. 66. The provisions of law which it thus recognized as operative, were the provisions of the Act of 1864, ch. 346, governing such details.

Although in colonial times, and since Maryland became a State, its legislation, in reference to tobacco, has been influenced mainly by the purpose to secure the means of identifying it as the growth of the State, and to maintain its merchantable character when exported, the Act of 1872, ch. 36, made no provision whatever in relation to the exportation of unlawful tobacco,—that is to say, of tobacco packed in any hogshead of greater dimensions than those prescribed, nor in relation to carrying out of this State, in hogsheads, any tobacco grown in the State, which had not been inspected, passed and marked in accordance with the provisions of laws in existence when it was enacted.

It was not necessary that it should have done so, because these essential particulars, omitted in the new Article added to the Code of Public General Laws by the Act in question, were minutely set forth in the Code of Public Local Laws, relating to the City of Baltimore, under their proper sub-title. The new Act, according to the express terms of its 33rd section, was not intended to repeal all prior legislation upon the subject, but only such laws, or parts of laws, as were inconsistent with its own provisions. Those parts of the Public Local Law which were not inconsistent with its provisions, remained operative.

The Legislature, in enacting the Act of 1872, ch. 36, provided a large staff of officers, paid by the State, to perform the duties, which the law directed to be performed in connection with tobacco grown in the State. It placed these officers in costly warehouses, which had been built by the State in order that such officers might be better enabled to perform their duties. It fixed by law the form of the package in which tobacco grown in the State should be encased before exportation. It did all this to fix the identity and weight of tobacco alleged to have grown in this State, and thus preserve the reputation of this commodity in the markets of the world. It cannot

be supposed that the Legislature maintained the costly equipment mainly required to secure the identity of a principal domestic staple, and yet had relinquished all control over the means of ascertaining such identity.

The purpose of the Act of 1872, ch. 36, was to select from the mass of the Public Local legislation, in relation to tobacco, certain portions, and to re-enact these in a Public General Law; and to leave the portions of the Public Local Law, which it did not thus digest, and which it neither repealed nor modified by inconsistent provisions, as existing parts of the Public Local Law. Among the provisions, which are wholly unaltered by the Act of 1872, ch. 36, were the special directions or provisions contained in secs. 10, 13 and 14 of the Act of 1864, ch. 346, and sec. 41 of the same Act, as amended by the Act of 1870, ch. 291, relating to exported tobacco.

The appellant was, therefore, properly convicted upon the first count of the indictment, if that section was not in contravention of the Constitution of the United States; for to " export" an article of commerce is to carry such article out of a country or place. *Richardson's Dict., word " Export."* The words " export" and " carry out of the State " are used as phrases equivalent in meaning in the Act of 1870, ch. 291. It is admitted by the demurrer to the first count, that the hogshead in question was exported from Baltimore to Bremen in Germany, without having been delivered at a State tobacco warehouse to be weighed, passed and marked as required by law.

The Act of 1872, ch. 36, provided for the appointment of one tobacco inspector for each of the five State tobacco warehouses in the City of Baltimore. It made, as is apparent from the whole scope of the Act, such respective warehouses the places where the duties of the inspectors should be performed, with the aid of the force which they were respectively entitled to appoint to assist them in the performance of their duties as such inspectors at such warehouses. Sec. 5. *Moore vs. State,* 47 *Md.,* 483, 484.

When officers are appointed to perform specific duties at particular places, in the examination of movable articles, and when it is required by law that such articles shall be subjected to such examination before they can be accounted lawful objects of commerce, it is plain that such articles, when intended for the uses of commerce, must be taken to the places appointed by law for their examination, and be *there* examined. 47 *Md.*, 483, 484.

It was, therefore, the duty of the appellant under the Act of 1870, ch. 291, to deliver the hogshead of tobacco in question at a State tobacco warehouse. Although under that Act, a hogshead of tobacco, grown in this State, and packed in the county, or neighborhood where it was grown, was not required to be *opened* for inspection, it was necessary that it should be ascertained, as matter of fact, that such tobacco was actually grown in the State and packed in the county or neighborhood where it was grown, and that such hogshead should be examined for the purpose of ascertaining whether it was of such dimemsions as to be accounted "lawful tobacco;" 1872, ch. 36, sec. 26; and that the hogshead containing the tobacco should be numbered; 1864, ch. 346, sec. 10; 1872, ch. 346, sec. 11; and weighed; 1864, ch. 346, sec. 13; 1872, ch. 36, sec. 11; and the gross weight of the hogshead be entered in a proper book, with sufficient reference to its numbers and marks. 1864, ch. 346, sec. 13; 1872, ch. 36, sec. 15. The Act of 1870, ch. 291, did not dispense with any of these requirements. These duties could certainly only be performed by the State Inspector.

The obvious purpose and use of the precaution of weighing, under the Act of 1864, or 1870, was to afford an opportunity, at any time, of determining whether the contents of the hogshead had been diminished, or tampered with, subsequent to its original packing, by comparison of a new weighing with the original gross weight marked upon the hogshead; or, if that had been improperly

altered, with the weight of the said hogshead as origi-
nally entered in connection with its marks and warehouse
number.   1864, ch. 346, sec. 10.

It was necessary that the hogshead of tobacco belonging
to the appellee, should be weighed, in gross, by the proper
State officer; because such weight was the standard of
the charges for *outage*, payable to the State under the Act
of 1872, ch. 36, sec. 20, an Act yet in force, and which
modified former Acts on the same subject.

The charge of outage was a legal charge imposed by
the State, under its system of legislation on this subject
since colonial days, as a means of reimbursement, in part,
for the expense which it incurred, because of the staff of
officers necessarily employed by it in opening for inspec-
tion, inspecting, weighing and marking hogsheads of
tobacco, grown in the State, or in examining the hogs-
heads in which tobacco, grown in the State, was packed,
and in ascertaining that such tobacco was in truth the
growth of this State.

The Acts of Assembly in controversy are not in con-
travention of any provision of the Federal Constitution.

The Constitution of the United States provides (Art. 1,
sec. 9, sub-clause 5,) that, " No tax or duty shall be laid
on articles exported from any State;" and (Art. 1, sec.
10, sub-clause 2) that, "No State shall, without the con-
sent of the Congress, lay any imposts, or duties on imports,
or exports, except what may be absolutely necessary for
executing its inspection laws;" and that " The powers
(10th amendment) not delegated to the United States by
the Constitution, nor prohibited by it to the States, are
reserved to the States respectively, or to the people."

"That inspection laws may have a remote and con-
siderable influence on commerce will not be denied; but
that a power to regulate commerce is the source from
which the right to pass them is derived, cannot be ad-
mitted.   The object of inspection laws is to improve the

quality of articles produced by the labor of a country; *to fit them for exportation, or it may be for domestic use. They act upon the subject before it becomes an article of foreign commerce, or commerce among the States, and prepare it for that purpose.* They form a portion of that immense mass of legislation, which embraces everything within the territory of a State not surrendered to the general government; all which can be most advantageously exercised by the States themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws regulating the internal commerce of a State, and those which respect turnpike roads, ferries, &c., are component parts of this mass." *Gibbons vs. Ogden*, 9 *Wheat.*, 203, MARSHALL, C. J.; *Hall vs. De Cuir*, 95 *U. S.*, 488.

I will venture to add to this exposition of the object of inspection laws, the further statement that they are enacted in part to afford the means of identifying articles as the growth, or production, of the industry of a particular State, and of increasing the prosperity of such State by maintaining and advancing the reputation of articles thus grown, or produced, within its territory. This particular object of inspection is well illustrated by the text of the preamble and body of the complete and admirable Statute of 1763, ch. 18, regulating the inspection of tobacco in the Province of Maryland; *Bacon's Laws*, 763; and in the preamble of the Act of 1789, ch. 26, modeled upon the earlier Act, and by the text of many subsequent Acts of this State relating to tobacco.

The scope and meaning of the language used by Chief Justice MARSHALL, in *Gibbons vs. Ogden*, and especially of that part of the opinion which I have italicised, will be better understood, by reading the argument of Mr. Emmet, one of the counsel in the case, which is fully reported; 9 *Wheat.*, 79–159; and especially by considering the examples, which he cites, in the note to pages 119–123 of his argument, of the exercise by States of the

power to act upon an article grown, or produced in a State, before it becomes an article of foreign, or domestic commerce, or of commerce among the States, to prepare it for such purpose. When we consider the language used by the Court, in connection with the examples of legislation in reference to inspections submitted to it in argument, we must interpret the portion of its opinion, to which we have referred, as affirming the constitutionality of legislation, which, while providing a means of ascertaining the quality of the article produced in a State, also defines the form of the lawful package, or its weight, and subjects the package as to quality and form, or quality, form and weight, to the supervision of the inspector, that he may ascertain that the required conditions of the article are entirely fulfilled.

The conclusion which must be deduced from the opinion of the Supreme Court in *Gibbons vs. Ogden,* may be aided by examples of legislation subsequent to that decision, prescribing the size, form, or weight, of packages containing articles grown or produced in any State, to the details of which the Court may readily refer. *Pennsylvania.* Beef and Pork intended for exportation, when packed, or repacked, in Philadelphia. 1 *Brightly's Purdon's Digest,* 1873, *pages* 157, 158; Butter and Lard, *Ibid,* 188, 189; Domestic Distilled Spirits, *Ibid,* 525; Flaxseed, *Ibid,* 708; Flour and Meal, *Ibid,* 711; Pot and Pearl ashes, 2 *Brightly's Purdon's Dig.,* 1162. *Virginia.* Tobacco, Code, 1873, *pages* 739, 740; Fish, *Ibid,* 750; Pitch, Tar, Turpentine, Salt, Staves, Shingles and Lumber, *Ibid,* 751. *Rhode Island.* Statutes, 1872; Beef casks, 230; Lime, 232; Fish, 233; Lumber, 236; Hoops, 238, 239; Scythe Stones, 240; Cord Wood, 249. *Maine.* Revised Stat., 1871; Lime, *ch.* 39. *sec.* 3; Pot and Pearl ashes, *Ibid, sec.* 9; Nails, *Ibid, sec.* 17; Fish, *Ibid, ch.* 40, *secs.* 7, 8 *and* 11; Cord Wood, *Ibid, ch.* 41, *sec.* 1; Charcoal baskets, *Ibid, sec.* 7; Packed Shingles, *Ibid, sec.* 16: Staves and

Hoops, *secs.* 18 *and* 19; Beef and Pork barrels, *Ibid, ch.* 38, *secs.* 16 *and* 17. *Massachusetts.* General Statutes, 1860; Casks for Pickled Fish, *ch.* 49, *sec.* 44; Alewives, *Ibid, sec.* 50; Staves, *Ibid, sec.* 85; Hogshead Hoops, *Ibid, sec.* 86; Casks for Pot and Pearl ashes, *Ibid, sec.* 167; Kegs for Butter and Lard, *Ibid, sec.* 14. *Connecticut.* General Statutes, 1875; Fish barrels, *page* 275, *sec.* 19. *Vermont.* General Statutes; Beef, or Pork barrels, *page* 496, *sec.* 6; Staves and Hoop-poles, *Ibid,* 503, *sec.* 63. *New Jersey.* Revision, 1877; Beef and Pork barrels, *page* 76; Flour and Meal casks, *Ibid,* 437; Herring casks, *Ibid,* 478. *Georgia.* Code, 1868; Flour barrels, *sec.* 1562; Turpentine barrels, *Ibid, sec.* 1573. *Louisiana.* Digest of Statutes, 1870; Beef and Pork barrels, *page* 38, *sec.* 28. *Wisconsin.* Statutes of; Fish casks, *page* 856, *sec.* 22. *Michigan.* Revised Statutes, 1846; Beef or Pork barrels, *page* 144, *sec.* 607; Fish casks, *Ibid, page* 148, *sec.* 44; Flour barrels, *Ibid, sec.* 50; Pot and Pearl Ash casks, *Ibid,* 151, *sec.* 74. *Iowa.* Code, 1873; Shingles, *sec.* 2074. *South Carolina.* General Statutes; Flour barrels, *page* 275; Beef barrels, *Ibid,* 279: Staves and Shingles, *Ibid,* 280. *North Carolina.* Battle's Revisal; Flour barrels, *ch.* 61, *sec.* 34, *page* 496; Beef or Pork casks, *Ibid, sec.* 50, *page* 499; Fish barrels, *Ibid, sec.* 53, *page* 499; Turpentine, Tar and Pitch barrels, *Ibid, sec.* 54, *page* 500; *Tennessee.* Statutes, 1871; Butter or Lard casks, *sec.* 1832; Flour barrels, 1834. *Mississippi.* Statutes Laws, 1840; Flour and Pork barrels, *page* 211. *Ohio.* Revised Statutes, 1880; Hogshead of Tobacco, *page* 264, *sec.* 39; Fish barrels, *Ibid, sec.* 4300; Spirit barrels, *sec.* 4327; Oil barrels, *sec.* 4293; Pot and Pearl Ash barrels, *sec.* 4291; Beef or Pork barrels, *sec.* 4285; Flour and Meal barrels, *sec.* 4281.

Our State legislation affords illustration of the exercise of the same power. Pot and pearl ashes, intended for exportation from Baltimore, or Georgetown, in Montgomery

County, were required to be packed in a particular manner in casks, and to be inspected and weighed. 1792; ch. 65. A similar provision was made to prevent the exportation of unmerchantable flour and unsound salted provisions from Havre de Grace by the Act of 1796, ch. 21; and from Chester by the Act of 1797, ch. 7. By the Act of 1781, ch. 12, provision was made to prevent the exportation of bread and flour, which was not merchantable, from the town of Havre de Grace. This Act was enacted for a limited time only and expired. It was revived and enacted into a permanent law by the Act of 1801, ch. 102, sec. 2, and is set forth in a note to the section last referred to in the Acts of 1801. By sec. 6 of the Act of 1801, ch. 102, the size of all flour casks brought to Baltimore Town for exportation, the character of the materials and make, the manner of hooping and nailing such hoops,—the particular length of the staves,—the diameter of the casks at the heads,—and the number of pounds of flour to be in each cask,—are each specifically prescribed. The size of laths, and the mode of packing them, was regulated by the Act of 1811, ch. 69. The number and character of hoops upon casks of ground black oak bark, exported from the port of Baltimore, was prescribed by the Act of 1821, ch. 77. The gross weight of a hogshead of tobacco, as well as its net weight, was required to be marked on the hogshead by the Act of 1789, ch. 26, sec. 21. The dimensions of the hogsheads in which tobacco was required to be packed was prescribed by sec. 35 of the Act last cited. Further illustration may be found in the following legislation: *Weighing Wheat,* 1858, *ch.* 256, *sec.* 5; *Frazier vs. Warfield,* 13 *Md.,* 300–304; *Fish Barrels and Tierces, Public Local Laws, Art.* 4, *sec,* 309; *Flour, Ibid, sec.* 352; *Domestic Distilled Liquors, Ibid, sec.* 360.

I may certainly fairly conclude from the opinion of the Supreme Court, to which I have referred, and from the

many examples, which I have given, that the General Assembly had the constitutional power to prescribe, as it has done, the form of the package, in which tobacco, grown in this State, should be encased, and to prescribe as it has done, the agencies which shall be employed to ascertain the weight of the package; and that such power was properly exercised by the Acts to which I have referred.

ROBINSON, J., delivered the opinion of the Court.

The appellant was indicted for violating the Tobacco Inspection Laws of this State.

The first count in the indictment charges, that the appellant being a grower of tobacco, packed a certain quantity of such tobacco in a hogshead of unknown dimensions, and exported it to Bremen, Germany, without having such hogshead of tobacco inspected and passed according to the laws of this State.

In addition to these facts, the second count charges, that he did not pay the *outage* due the State on the tobacco thus exported.

To this indictment the appellant filed a demurrer, and the question on this appeal, is whether the facts thus set forth constitute an indictable offence.

This question depends: 1st, upon the construction of the several statutes of this State regulating the inspection of tobacco; and 2ndly, upon the construction of the clause in the Constitution of the United States which provides, that "No State shall, without the consent of Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws." *Art.* 1, *sec.* 10, *sub-clause* 2.

By the Code of 1860, all prior laws in regard to the inspection of tobacco were codified as part of the " Public Local Laws," under the title of " City of Baltimore," subtitle Tobacco.

17                    v. 55.

These provisions of Public Local Law, were repealed by the Act of 1864, ch. 346, and certain new sections were inserted in lieu thereof.

The Act of 1864, provided for the appointment of Inspectors of Tobacco, defined their duties, and prescribed the mode and manner in which tobacco was to be inspected.

It prescribed the dimensions of the hogshead in which tobacco was to be packed, and required each hogshead of tobacco received at the State Tobacco Warehouse, to be numbered in succession as received, and provided for ascertaining the gross and net weight of each hogshead thus delivered.

Complete provision was made for the inspection of each hogshead by *sampling* after it was opened for inspection, and for staying and reconditioning unmerchantable tobacco.

It was provided that every hogshead of tobacco should be liable to a prescribed charge for *outage* in proportion to its weight, and the 41st section declared that it should "not be lawful to carry out of this State in hogsheads, any tobacco raised in this State, except in hogsheads which shall have been inspected, passed and marked agreeably to the provisions of this Act."

It will thus be seen that it was necessary in the first place, that the inspectors should examine the hogshead, to ascertain whether it was of *the dimensions required by the Act;* and in the next, that they should inspect the tobacco itself by *sampling the contents.* When this was done and the weight ascertained the hogshead was passed.

By the Act of 1870, ch. 291, the grower or purchaser of tobacco packed in the county or neighborhood, was permitted to export the same without having the hogshead opened for inspection by sampling its contents; but the Act required such hogshead to be marked with the name and residence of the owner, and to be liable for the charge

of outage as in other cases, and any one violating its provisions was liable to the penalty imposed by sec. 41 of the Act of 1864.

The Act of 1870, in thus permitting the grower or purchaser of tobacco packed in the county or neighborhood, to export the same without having the hogshead opened for inspection, does not dispense with any other requirement of the Act of 1864, in regard to inspection. It provides in express terms, that each hogshead thus packed shall be marked with the name and residence of the owner. and it was necessary therefore that some one should ascertain whether these requirements were complied with, and whether the tobacco was in fact the growth of the county or neighborhood where it was packed. It also required that such tobacco should be liable for the same charge of outage as in other cases, and as the charge of outage depended upon the weight of the hogshead, it was necessary that some one should ascertain the weight of such hogshead, in order to determine the amount to be paid. It did not change or in any manner dispense with the statutory requirements in regard to the dimensions of the hogshead in which such tobacco was to be packed, and it was necessary that some one should see that these requirements were complied with. These and other duties, it is obvious, were to be performed by the inspectors, and when performed the hogshead was to be passed and marked as provided by the Act of 1864. When the words *"such tobacco so carried out of the State without inspection,"* are read in connection with the preceding sentence, which permits the grower or purchaser to export such tobacco "without having the same opened for inspection," it is clear the term *"without inspection,"* refers to inspection by opening the hogshead and sampling the contents.

While the Act of 1864, as amended by the Act of 1870, was in force, the Legislature passed the Act of 1872, ch. 36, entitled an Act to add a new Article to the Code

of Public General Laws, regulating the Inspection of Tobacco.

This Act changes in some respects the provisions of the Act of 1864, omits others, and in express terms repeals all Acts or parts of Acts inconsistent with its provisions.

The penal clause of the Act of 1864, as amended by the Act of 1870, which made it unlawful to carry out of the State in hogsheads tobacco raised in this State, except in hogsheads inspected, passed and marked according to the provisions of the Act, is omitted in the Act of 1872. And the appellant insists, that this Act was intended as a substitute for all prior Acts on the subject; and that there is now no law in force in this State by which the inspection of tobacco is made compulsory. It seems to be well settled, that where the Legislature makes a revision of particular statutes, and passes a general statute upon the subject, and it is evident from the general frame-work of the statute, and the manner in which the subject-matter is dealt with, that the Legislature intended such general statute to be a complete system of legislation in regard to the matter, the statute thus passed must be considered as *a substitute for all prior laws on the subject;* and the provisions of such prior laws as are not embraced by the later statute, are thereby repealed.

It was upon this principle that the General Incorporation Act of 1868, framed by commissioners appointed in pursuance of the Constitution of 1867, was held to be *a substitute* for all prior laws in regard to corporations. *Montell & Co. vs. Consol. Coal Co.,* 39 *Md.,* 164.

We find nothing, however, either in the title, or general frame-work of the Act, or in the manner in which the subject-matter is dealt with, to justify the conclusion that the Legislature intended the Act of 1872, as a substitute for all prior legislation on the subject. By the title, it merely proposes to add a new Article to the Code of General Laws regulating the inspection of tobacco.

No reference whatever is made to prior laws, except to repeal all Acts inconsistent with its provisions. If we examine its several sections and compare them with the sections of the Act of 1864, in regard to the same matter, it is apparent, we think, the Legislature did not intend the Act of 1872, to be a revision and substitute for all prior laws regulating the inspection of tobacco. On the contrary, the provisions of such prior laws are absolutely essential to give completeness to the system of which the Act of 1872 is but a part. It does not, it is true, make it *unlawful to export* tobacco raised in this State, unless the same shall have been inspected and passed, but it does provide, that "no tobacco, the growth of this State, shall be *passed or accounted lawful tobacco,* unless the same be packed in hogsheads of certain prescribed dimensions."

It does not say in so many words, that the tobacco raised in this State, and intended for exportation, shall be delivered at one of the State Tobacco Warehouses, but it does provide for the appointment of inspectors of tobacco, clerks, and other officials, with fixed salaries, and assigns them to the tobacco warehouses, with no other duty to perform, unless it be the inspection of tobacco.

In thus declaring that no tobacco, the growth of this State, shall be accounted *lawful tobacco,* unless packed in the manner prescribed by the Act, it is plain the Legislature meant it to be the duty of the inspectors appointed by the Act, to ascertain whether such tobacco was thus packed in conformity with the requirements of the statute; and this they could not do, unless such tobacco was delivered at the State Tobacco Warehouses. The Legislature, from the earliest history of the colony, and since the formation of the State government, has made the inspection of tobacco raised in this State compulsory. To this end, the State has expended nearly a million of dollars in the erection of tobacco warehouses in the City of Baltimore, and the very Act now under consideration, and

which it is insisted repeals such laws, appoints a large staff of officers with salaries for the purpose of inspecting tobacco. If then it had been the intention of the Act of 1872 to abandon this policy so long recognized by the State, it is but reasonable to suppose, that the Legislature would have declared such intention in plain and unambiguous terms, and not left it to be ascertained by construction and implication.

With the policy of inspection laws, whether they act as restraints on trade alike injurious to the producer and consumer, are questions for the consideration of the law-making power. Our duty is simply to declare what the law is, and the question here is, whether the Act of 1872 was intended as a substitute for all prior laws on the subject? In our opinion it was not. The Legislature meant, and only meant, to select certain provisions from the Public Local Law in relation to the inspection of tobacco, and to re-enact these in a Public General Law, and to leave such portions of the Local Law which it did not thus re-enact, and did not modify or repeal by inconsistent provisions, as existing parts of the Local Law.

The Act of 1872 did not modify or repeal sec. 41 of the Act of 1864, as modified by the Act of 1870, which constituted part of the Local Law, and under that section it was the duty of the appellant to have delivered the tobacco packed by him to one of the State tobacco warehouses, in order that the inspectors might ascertain whether it was packed in hogsheads of the proper dimensions, and whether it was packed in the county or neighborhood where it was grown, and marked as the statute directed.

And this brings us to the second question, whether the charge of *outage* is in contravention of the Constitution of the United States, which prohibits any State from levying a tax on imports or exports, except so far as such tax may be absolutely necessary for the execution of its

*inspection laws.* And this question resolves itself into this, whether this charge of outage is an inspection duty within the meaning of the Constitution? If it be an inspection duty, then it is no objection to the duty itself, because it partakes of the nature of a tax on exports.

In considering the powers of a State to pass inspection laws under this clause of the Constitution, Chief Justice MARSHALL says:

"If it be a rule of interpretation to which all assent, that the exception of a particular thing from general words proves that, in the opinion of the law-giver, the thing excepted would be within the general clause had not the exception been made, we know of no reason why this general rule should not be as applicable to the Constitution as to other instruments. * * * The exception was made because the tax would otherwise have been within the prohibition."

We come then to the question, whether the charge of outage is an inspection duty? It is urged on the part of the appellant, that under the Act of 1864, as modified by the Act of 1870, the only duty to be performed by the inspector in this case, was an examination of the hogshead, to ascertain whether it was of the proper dimensions, and to ascertain further, whether it was packed by the appellant as grower in the county or neighborhood where it was grown; and that the charge of outage under such circumstances is not an inspection duty within the meaning of the Constitution.

The object of inspection laws ordinarily is to improve the quality of the productions of a country, and thereby better fit them for domestic use, or for exportation. But we are by no means prepared to concede, that the inspection must be confined to an examination of the quality ot the article itself. To prepare the products of a State for exportation, it may be necessary that such products should be put in packages of a certain form, and of cer-

tain prescribed dimensions. This may be necessary, either on account of the nature and character of such products, or to enable the State to identify the products of its own growth, and to furnish the evidence of such identification in the markets to which they are exported.

In the brief filed by the Attorney-General, he has industriously collected the several statutes of the States on this subject, and it appears from the earliest period of the government, that nearly every State has prescribed by law the size, form and weight of packages containing articles grown or produced by such States, and has made the size and weight of such packages subject to inspection. Many of these statutes are referred to by Mr. Emmet in his argument in the celebrated case of *Gibbons vs. Ogden,* 9 *Wheaton,* 120, and in delivering the opinion of the Court in that case, Chief Justice MARSHALL nowhere intimates that such statutes are not a valid exercise of legislative power.

We must conclude, therefore, that the State has the power to prescribe the dimensions of the hogshead in which tobacco raised in this State is packed, and to require such hogshead to be delivered at one of the State tobacco warehouses, in order that the inspectors may ascertain whether it conforms to the requirements of the law, and whether it is the true growth of the State, and packed by the grower or purchaser in the county or neighborhood where it was grown. And that the charge of outage, to reimburse the State for the expenses thereby incurred, and in consideration of storage of such hogshead of tobacco, is in the nature of an inspection duty within the meaning of the Constitution of the United States.

There was no error therefore in overruling the demurrer to the indictment.

The objection to the fine of three hundred dollars imposed by the Court is equally untenable. It was the duty of the appellant to have delivered the hogshead of tobacco

mentioned in the indictment to one of the State tobacco warehouses, in order that the inspectors might ascertain whether such hogshead was of the dimensions required by the statute, and whether the tobacco was packed as required by the Act of 1870, and upon his failure to do so, the appellant was liable to the penalty prescribed by sec. 41 of the Act of 1864. It was his duty also under the Act of 1870, to mark the hogshead with his full name, but the Legislature never meant that merely marking the name of the grower or purchaser on the hogshead, released such grower or purchaser from the other requirements of the Act.

The judgment below must therefore be affirmed.

*Judgment affirmed.*

(Decided 21st January, 1881.)