## TURNER *v.* MARYLAND.

1. Section 41 of chapter 346 of the laws of Maryland of 1864, as amended and re-enacted by chapter 291 of the laws of 1870, provides as follows : " After the passage of this act, it shall not be lawful to carry out of this State, in hogs-heads, any tobacco raised in this State, except in hogsheads which shall have been inspected, passed, and marked agreeably to the provisions of this act, unless such tobacco shall have been inspected and passed before this act goes . into operation ; and any person violating the provisions of this section shall forfeit and pay the sum of three hundred dollars, which may be recovered in any court of law of this State, and which shall go to the credit of the to-bacco fund : *Provided,* that nothing herein contained shall be construed to prohibit any grower of tobacco, or any purchaser thereof, who may pack the same in the county or neighborhood where grown, from exporting or carrying out of this State any such tobacco without having the same opened for inspection ; but such tobacco so exported or carried out of this State without inspection shall in all cases be marked with the name in full of the owner thereof, and the place of residence of such owner, and shall be liable to the same charge of outage and storage as in other cases, and any person who shall carry or send out of this State any such tobacco, without having it so marked, shall be subject to the penalty prescribed by this section." Under that proviso, no requirement of the act of 1864 is dispensed with, ex-cept that of having the hogshead opened for inspection. The hogshead must still be delivered at a State tobacco warehouse, and there numbered and recorded and weighed and marked, and be found to be of the dimen-sions prescribed by statute, and to have been packed and marked as re-quired. *Held,* 1. That said section 41, as so amended and re-enacted, is not, in its provisions as to charges for outage and storage, in violation of clause 2 of section 10 of article 1 of the Constitution of the United States, as respects any impost or duty imposed by it on exports, or of the clause of section 8 of article 1 which gives power to the Congress " to regulate com-merce with foreign nations and among the several States ; " nor is it a regu-

lation of commerce or unconstitutional, as discriminating between the State buyer and manufacturer of leaf tobacco and the purchaser who buys for the purpose of transporting the tobacco to another State or to a foreign country, or as discriminating between different classes of exporters of tobacco.  2. That the charge for outage, thereby made, is an inspection duty, within the meaning of the Constitution, and it is not foreign to the character of an inspection law to require every hogshead of tobacco to be brought to a State tobacco warehouse.  3. That dispensing with an opening for inspection of the hogsheads mentioned in the proviso does not, in view of the other provisions of the tobacco inspection statutes of the State, deprive those statutes of the character of inspection laws.

2. The characteristics of inspection laws considered, with references to the legislation of the American colonies and the States on the subject.

3. *Quære*, Is it not exclusively the province of Congress to determine whether a charge or duty, under an inspection law, is or is not excessive.

4. The charge for outage in this case appears to be a charge for services properly rendered.

ERROR to the Court of Appeals of the State of Maryland.

The case is stated in the opinion of the court.

*Mr. John K. Cowen* and *Mr. Eben J. D. Cross* for the plaintiff in error.

*Mr. Charles J. M. Gwinn*, Attorney-General of Maryland, *contra*.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

The question presented for our consideration on this writ of error is the constitutional validity of certain provisions in the tobacco inspection statutes of the State of Maryland.

The plaintiff in error, Turner, was indicted in the Criminal Court of Baltimore.  The indictment contained two counts. The first count alleged that Turner packed in a hogshead tobacco grown by him on a farm belonging to him in Charles County, in Maryland, and marked the hogshead with his full name and his place of residence in said county, and shipped it to the city of Baltimore; that it was not delivered at any tobacco warehouse in said city, under the management or control of any inspector of tobacco appointed for said warehouse by the governor of the State of Maryland, under the Constitution and laws of said State, nor to any one of said inspectors of tobacco, nor to any one acting under the authority of any one of said inspectors of tobacco, to be weighed, passed, or marked, and it was not weighed, passed, and marked by any such in-

spector of tobacco, nor by any person acting under the authority of any one of said inspectors of tobacco ; but that the said Turner exported it from said city to Bremen, in Germany, without having procured it to be weighed, passed, and marked by any such inspector of tobacco, or by any person acting under the authority of any one of said inspectors of tobacco. The second count contained the same allegations, and the further averment that the said Turner did not, prior to said exportation, pay or cause to be paid any sum of money due for outage, or any sum of money due for storage, to the State of Maryland, on said hogshead, to any such inspector of tobacco, or to any other person having authority to receive the same, although certain sums of money were due and payable by him to said State for outage and storage on said hogshead.

Separate demurrers were filed to each count of the indictment, and then a written stipulation was filed by the parties, as follows : "It is agreed in this case, 1. That the matters and facts charged in the indictment in this case are true, as therein stated. 2. That for the more speedy final determination of the questions of law involved in this case the demurrers which the traverser has entered to this indictment shall be overruled *pro forma* by the court. 3. That after such overruling of the demurrers the case shall be forthwith submitted to the court, without the intervention of a jury, upon the admission contained in the first paragraph of this agreement." The demurrers were then overruled. The court then rendered a judgment that Turner pay a fine of $300. On the same day, Turner, by petition to said criminal court, setting forth that he had been adjudged guilty of a misdemeanor, and by the judgment of said court ordered to pay the sum of $300 to said State, prayed an appeal to the Court of Appeals of Maryland, assigning errors in the record. That court affirmed the judgment, and Turner has brought the case into this court by a writ of error, alleging that the statutes of Maryland on which the indictment was founded, and the validity of which was sustained by the State court, are repugnant to the Constitution of the United States.

It is claimed by the defendant in error that the statutory provisions the validity of which is denied by the plaintiff in

error are "inspection laws," within the meaning of clause 2 of
section 10 of article 1 of the Constitution of the United States,
which clause is as follows: "No State shall, without the con-
sent of the Congress, lay any imposts or duties on imports or
exports, except what may be absolutely necessary for executing
its inspection laws; and the net proceeds of all duties and·im-
posts laid by any State on impórts, or exports, shall be for the
use of the treasury of the United States; and all such laws
shall be subject to the revision and control of the Congress."

By chapter 346 of the laws of Maryland of 1864, a new to-
bacco inspection law was enacted, as part of the code of public
local laws, in place of and expressly repealing certain portions
of said code. Sect. 1 provides for the appointment of five
tobacco inspectors, one for each State tobacco warehouse in
the city of Baltimore. By sect. 5 each tobacco inspector is
required to employ such clerks and laborers, and provide and
keep on hand such books, implements, and materials, as may
be necessary for the economical and effective discharge of his
duties as such inspector, and the salaries of the various clerks
and laborers are prescribed, to be paid from the receipts in the
respective offices, with the requirement that the inspectors
shall at no time employ more labor than shall be necessary for
the effective performance of the work to be done. There are
provisions to facilitate the landing of tobacco at the wharves in
front of the warehouses, and its removal therefrom, and to
secure the safe preservation of the tobacco after its delivery
at the warehouse. Sect. 10 is as follows: "It shall be the
duty of each tobacco inspector to cause each hogshead of to-
bacco landed or delivered at the warehouse to which he is ap-
pointed to be numbered in succession as received, and to cause
said number to be entered in a book kept for that purpose, to-
gether with the time said hogshead was received, the name of
the vessel or other conveyance, if known to him, by which said
hogshead was brought to the city of Baltimore, and of the
owner or consignee of said tobacco, and the initials or other
marks on said hogshead, identifying the same; and, when said
hogshead shall be removed from said warehouse, he shall cause
an entry to be made, in some book kept for that purpose, of
the time when the same was so removed, the name of the per-

son to whom the same was delivered, and of the vessel or other conveyance by which the same was taken away." It is provided by sect. 12 that each inspector shall cause all the tobacco in the warehouse to which he may have been appointed to be inspected as speedily as practicable, in regular order, as numbered; and by sect. 13 that he shall cause each hogshead of tobacco, before it is uncased, to be weighed, and the tobacco in each hogshead and the cask itself to be separately weighed, and the weight of each hogshead, as first weighed, and the gross and net weight of the tobacco therein contained, after inspection, to be entered in a proper book, with sufficient reference to its marks and numbers as previously recorded; and by sect. 14 that he shall mark on the side of each hogshead, with a marking-iron, its warehouse number and weight, and the net weight of tobacco contained therein, and its warehouse number on each head, with blacking; and, by succeeding sections, that he shall uncase and break all tobacco, in whatever State raised, and draw samples from each hogshead, and tie each lot of samples together, and label it with the warehouse number of the hogshead, and the number of the warehouse, and the date of inspection, and the name of its owner, or, if known, the initials or other marks on the hogshead, and deliver it sealed, if the tobacco be merchantable, to the owner, with a certificate stating the date of inspection, the warehouse mark and number of the hogshead, the weight thereof, and the net weight of the tobacco in it, and that unmerchantable tobacco shall be reconditioned, packed, reweighed, and reinspected, and then sampled and certified; and by sect. 27 that every hogshead shall be liable to the charge of $1.50 outage, if weighing less than 1,100 pounds, and to 15 cents additional for every 100 pounds, which shall be paid by the purchaser thereof to the inspector, before it is removed. Penalties are imposed by sect. 40 for erasing, altering, or adding to any mark placed by the inspector on any hogshead or any label of any sample, and for fraudulently taking any tobacco from a sample, or substituting other tobacco for any in such sample, and for counterfeiting any inspector's certificate or seal. Sect. 41 is as follows: "After the passage of this act, it shall not be lawful to carry out of this State, in hogsheads, any tobacco raised in this State,

except in hogsheads which shall have been inspected, passed, and marked agreeably to the provisions of this act, unless such tobacco shall have been inspected and passed before this act goes into operation; and any person violating the provisions of this section shall forfeit and pay the sum of three hundred dollars, which may be recovered in any court of law of this State, and which shall go to the credit of the tobacco fund." This section was amended by chapter 291 of the laws of 1870, by re-enacting it with the following addition: "*Provided*, that nothing herein contained shall be construed to prohibit any grower of tobacco, or any purchaser thereof, who may pack the same in the county or neighborhood where grown, from exporting or carrying out of this State any such tobacco without having the same opened for inspection; but such tobacco so exported or carried out of this State without inspection shall in all cases be marked with the name in full of the owner thereof, and the place of residence of such owner, and shall be liable to the same charge of outage and storage as in other cases, and any person who shall carry or send out of this State any such tobacco, without having it so marked, shall be subject to the penalty prescribed by this section." Sect. 42 prescribes the size of the casks in which tobacco raised in Maryland shall be packed, and forbids the inspector to inspect or pass it until packed in a hogshead of proper dimensions.

By chapter 36 of the laws of 1872, entitled "An Act to add a new article to the code of public general laws regulating the inspection of tobacco," some additional regulations were made, and some existing provisions were re-enacted, and some changes were made, and all inconsistent provisions of law were repealed; but the only material additions or changes made, so far as the present case is concerned, were these: By sect. 11, every inspector shall have uncased and break every hogshead of tobacco delivered for inspection, in so many places for Maryland and Ohio, and in so many places for Kentucky and Virginia, and, if the tobacco is sound, take a sample, and mark the hogshead with its number, the year of inspection, and the initials of the owner on each head and on the bilge, and the tare and net weight on the bilge. By sect. 15, each inspector shall keep in a book "the name of the owner, the number, gross, tare, and

net weight of every hogshead of tobacco inspected by him, the State where grown, the consignee of the same, the name of the vessel by which shipped out, and the name of the party shipping the same, and for every hogshead so inspected by him he shall issue his certificate or note, stating in such certificate or note the name or initials of the owner, the number of the hogshead, the State where grown, the date of inspection, and the gross, tare, and net weight of the hogshead, and he shall make no delivery of inspected tobacco from his warehouse except upon surrender of the certificate or note corresponding with the number of the hogshead." By sect. 26, "no tobacco of the growth of this State shall be passed or accounted lawful tobacco unless the same be packed in hogsheads not exceeding fifty-four inches in length of the staves, nor exceeding forty-six inches across the head, and the owner, or his agent, of tobacco packed in any hogshead of greater dimensions shall repack the same in hogsheads of the size herein prescribed, at his own expense, before the same shall be passed."

By chapter 228 of the laws of 1872, the charge for outage is fixed at $2 for every hogshead not exceeding 1,100 pounds, and 12½ cents additional on every 100 pounds over 1,100 pounds, to be paid by the shipper of the tobacco, or his agent.

In order to determine whether the statutory provisions in question are obnoxious to the objection made, their meaning must be ascertained. The act of 1864 requires the inspector to examine the hogshead to ascertain whether it is of the required dimensions, and then to inspect the tobacco itself by sampling the contents, and, when this has been done, and the weight ascertained, the hogshead is passed. In regard to the addition made by the act of 1870, c. 291, to sect. 41 of the act of 1864, the grower or purchaser of tobacco packed in the county or neighborhood where it is grown is permitted to export the same without having the hogshead opened for inspection by sampling its contents; but the act requires such hogshead to be marked with the name and residence of the owner, and it is made liable to the charge of outage as in other cases, and any one violating its provisions is subjected to the penalty imposed by sect. 41 of the act of 1864. The act of 1870, in thus permitting the grower or purchaser of tobacco

packed in the county or neighborhood where it is grown to export the same without having the hogshead opened for inspection, does not dispense with any other requirement of the act of 1864 in regard to inspection. It provides, in express terms, that each hogshead thus packed shall be marked with the name and residence of the owner. It is necessary, therefore, that some one shall ascertain whether these requirements have been complied with, and whether the tobacco was, in fact, the growth of the county or neighborhood where it was packed. It also requires that such tobacco shall be liable to the same charge of outage as in other cases, and, as the charge of outage depends upon the weight of the hogshead, it is necessary that some one shall ascertain the weight of such hogshead, in order to determine the amount to be paid. It does not change or in any manner dispense with the statutory requirements in regard to the dimensions of the hogshead in which such tobacco is to be packed, and it is necessary that some one shall see that these requirements are complied with. These and other duties, it is obvious, are to be performed by the inspectors, and when they are performed the hogshead is to be passed and marked as provided by the act of 1864. When the words "such tobacco so exported or carried out of this State without inspection" are read in connection with the preceding sentence, which permits the grower or purchaser to export such tobacco "without having the same opened for inspection," it is clear that the term "without inspection" refers to inspection by opening the hogshead and sampling the contents.

The act of 1872, c. 36, changes some of the provisions of the act of 1864, omits others, and in express terms repeals all acts or parts of acts inconsistent with its provisions. The penal clause of the act of 1864, as amended by the act of 1870, which makes it unlawful to carry out of the State in hogsheads tobacco raised in the State, except in hogsheads inspected, passed, and marked according to the provisions of the act, is omitted in the act of 1872; but there is nothing, either in the title or the general framework of the act, or in the manner in which the subject-matter is dealt with, to justify the conclusion that the legislature intended the act of 1872 as a substitute for all prior legislation on the subject. The provisions of such prior

laws are essential to give completeness to the system of which the act of 1872 is but a part. That does not, it is true, make it unlawful to export tobacco raised in the State unless the same shall have been inspected and passed, but it does provide that no tobacco, the growth of the State, shall be passed or accounted lawful tobacco unless the same be packed in hogsheads of certain prescribed dimensions. It does not say, in so many words, that the tobacco raised in the State and intended for exportation shall be delivered at one of the State tobacco warehouses, but it does provide for the appointment of inspectors of tobacco, clerks and other officials, with fixed salaries, and assigns them to the tobacco warehouses, with no duty to perform unless it be the inspection of tobacco. In thus declaring that no tobacco, the growth of the State, shall be accounted lawful tobacco unless packed in the manner prescribed by the act, it is plain the legislature meant it to be the duty of the inspectors appointed by the act to ascertain whether such tobacco was thus packed in conformity with the requirements of the statute, and this they could not do unless such tobacco should be delivered at the State tobacco warehouses. The legislature meant, and only meant, to select certain provisions from the public local law in relation to the inspection of tobacco, and to re-enact these in a public general law, and to leave such portion of the local law which it did not thus re-enact and did not modify or repeal by inconsistent provisions, as existing parts of the local law. The act of 1872 did not modify or repeal sect. 41 of the act of 1864, as modified by the act of 1870, which constituted part of the local law; and under that section it was the duty of the plaintiff in error to have delivered the tobacco packed by him at one of the State tobacco warehouses, in order that the inspectors might ascertain whether it was packed in hogsheads of the proper dimensions, and whether it was packed in the county or neighborhood where it was grown, and marked as the statute directed. The legislature did not intend that merely marking the name of the grower or purchaser on the hogshead should release such grower or purchaser from the other requirements of the act. These views are those which were held by the Court of Appeals of Maryland in its opinion delivered in this

case. 55 Md. 240. The result is, that all that the act of 1870 does in regard to a grower or purchaser of tobacco raised in Maryland, who packs the same in hogsheads in the county or neighborhood where such tobacco is grown, and who exports it or carries it out of the State, is to dispense with the opening of such hogsheads for inspection, but that it does not dispense with any other requirement of the act of 1864 in regard to inspection; and that it is a part of such inspection for the inspector to see that the hogshead is marked with the name and place of residence of the owner, and to verify the claimed fact that the tobacco was raised in Maryland and packed in the county or neighborhood where it was grown, and to weigh the hogshead in order to determine the charge for outage, and to see that the hogshead conforms in dimensions to the requirement of the statute, so that the tobacco may be passed and accounted lawful tobacco. It is also apparent, that not until the above and other duties have been performed by the inspectors can the hogshead be passed and marked as required by the act of 1864. This requires, in regard to the hogsheads specially mentioned in the proviso enacted in 1870 to sect. 41 of the act of 1864, that they be delivered at one of the State tobacco warehouses, and that the provisions of sect. 10 of the act of 1864 be observed, that is, that the inspector shall number each hogshead in succession, and enter the number in a book, with the time the hogshead is received, and the name, if known, of the conveyance by which it was brought to Baltimore, and the name of the owner or consignee of the tobacco, and the initials or other marks on the hogshead identifying it, and, on its removal, enter in a book the time of removal, and the name of the person to whom it is delivered, and of the conveyance by which it is taken away; that, under sect. 12 of the act of 1864, it shall be inspected in all required particulars except opening it; that, under sect. 13 of that act, the inspector shall weigh the hogshead unopened and enter such weight in a book, with sufficient reference to its marks and numbers as previously recorded; that, under sect. 14 of that act, the inspector shall mark with a marking-iron, on the side of each hogshead, its warehouse number and weight, and on each head its warehouse number; and that not until these things have

been done is the tobacco to be passed or accounted as lawful tobacco.

The plaintiff in error contends that sect. 41 of the act of 1864, as re-enacted by the act of 1870, violates the Constitution of the United States, because: 1. It is a regulation of inter-state and foreign commerce, and a law levying a duty on exports, and does not fall within the class of laws known as inspection laws, because the proviso enacts that the tobacco to which it refers need not be opened for inspection. 2. Said section, even though it is an inspection statute, discriminates against the non-resident buyer and manufacturer of leaf tobacco, and in favor of the State buyer and manufacturer, in imposing burdensome regulations on tobacco intended for export, and laying a tax of at least two dollars a hogshead on such tobacco when exported, while tobacco manufactured within the State is free from such regulations and such tax, and thus it discriminates against inter-state and foreign commerce in tobacco, and in favor of local manufacturers and the internal trade of the State. 3. Said section discriminates between different classes of exporters of tobacco, in that it permits tobacco exported by persons who pack it in the county or neighborhood where it is grown, to be exported when marked with the full name and residence of the owner, without inspection other than the examination of the outsides of the hogsheads, while exporters of another class must have the contents of their hogsheads subjected to examination.

The provisions of the Constitution of the United States alleged to be violated are clause 2 of section 10 of article 1, before quoted, and that clause of section 8 of article 1 which provides that the Congress shall have power " to regulate commerce with foreign nations and among the several States."

The Maryland court held that the charge of outage in this case was an inspection duty, within the meaning of the Constitution; that the State had the power to prescribe the dimensions of the hogshead in which tobacco raised in Maryland shall be packed, and to require such hogshead to be delivered at one of the State tobacco warehouses, in order that the inspectors may ascertain whether it conforms to the requirements of the law, and whether it is the true growth of the State and

packed by the grower or purchaser in the county or neighborhood where it was grown ; and that the charge of outage, to reimburse the State for the expenses thereby incurred, and in consideration of the storage of the hogshead, is in the nature of an inspection duty, within the meaning of the Constitution.

The contention of the plaintiff in error is, that a law which otherwise would be an inspection law ceases to be such if no provision is made for opening the package containing the article and examining the quality of its contents. On this subject the Maryland court held, that, in order to constitute an inspection law, an examination of the quality of the article itself is not necessary ; but that to prepare the products of a State for exportation it may be necessary that such products should be put in packages of a certain form, and of certain prescribed dimensions, either on account of the nature and character of such products, or to enable the State to identify the products of its own growth, and to furnish the evidence of such identification in the markets to which they are exported. In opposition to these views, which appear to us to be sound, we are asked to hold that the provisions under consideration do not fall under the head of inspection laws, in a case where the question is presented without the finding of any facts to show that what *may* be thus necessary in regard to a product is not necessary in regard to tobacco, and with every presumption to the contrary arising out of the course of legislation as to the inspection of tobacco, by the State of Maryland. The legislature of the State of Maryland, from the earliest history of the colony and since the formation of the State government, has made the inspection of tobacco raised in that State compulsory. That inspection has included many features, and has extended to the form, size, and weight of the packages containing the tobacco, as well as to the quality of the article. Fixing the identity and weight of tobacco alleged to have been grown in the State, and thus preserving the reputation of the article in markets outside of the State, is a legitimate part of inspection laws, and the means prescribed therefor in the statutes in question naturally conduce to that end. Such provisions, as parts of inspection laws, are as proper as provisions for inspecting quality ; and it cannot be said that the absence of the latter

provisions, in respect to any particular class of tobacco, necessarily causes the laws containing the former provisions to cease to be inspection laws. It is easy to see that the use of the precaution of weighing and marking the weight on the hogshead and recording it in a book is to enable it to be determined at any time whether the contents have been diminished subsequently to the original packing, by comparing a new weight with the original marked weight, or, if the marked weight be altered, with the weight entered in the warehouse book. The things required to be done in respect to the hogshead of tobacco in the present case, aside from any inspection of quality, are to be done to prepare and fit the hogshead, as a unit, containing the tobacco, for exportation, and for becoming an article of foreign commerce or commerce among the States, and are to be done before it becomes such an article. They are properly parts of inspection laws, within the definition given by this court in *Gibbons* v. *Ogden*, 9 Wheat. 1. In a note to the argument of Mr. Emmet in that case, at page 119, are collected references to many statutes of the States, in the form of inspection laws, showing what features have been generally recognized as falling within the domain of those laws, — such as the size of barrels or casks, and the number of hoops on them ; what pieces of beef or pork, and what quantity and size of nails, should be in one cask ; the length, breadth, and thickness of staves and heading, lumber, boards, shingles, &c. ; and the branding of pot and pearl ashes, flour, fish, and lumber, and the forfeiture of them, if unbranded. These were cited as instances of the exercise by States of the power to act upon an article grown or produced in a State, before it became an article of foreign or domestic commerce, or of commerce among the States, to prepare it for such purpose. It was in reference to laws of this character that it was said, in argument, in *Gibbons* v. *Ogden*, that the enactments seemed arbitrary, and were not founded on the idea that the things the exportation of which was thus prohibited or restrained were dangerous or noxious, but had for their object to improve foreign trade and raise the character and reputation of the articles in a foreign market. It was in reference to such laws, among other inspection laws, that Chief Justice Marshall, in *Gibbons*

v. *Ogden*, p. 203, after remarking that a power to regulate commerce was not the source from which a right to pass inspection laws was derived, said: " The object of inspection laws is to improve the quality of articles produced by the labor of a country; to fit them for exportation; or, it may be, for domestic use.  They act upon the subject before it becomes an article of foreign commerce, or of commerce among the States, and prepare it for that purpose.  They form a portion of that immense mass of legislation which embraces everything within the territory of a State, not surrendered to the general government: all which can be most advantageously exercised by the States themselves."  It was not suggested by the court that those particular laws were not valid exercises of the power of the State to fit the articles for exportation, or that in addition to, or even aside from, ascertaining the quality of the article produced in a State, the State could not define the form of the lawful package or its weight, and subject form and weight, with or without quality, to the supervision of an inspector, to ascertain that the required conditions in respect to the article were observed.

In addition to the instances cited in *Gibbons* v. *Ogden*, the diligence of the attorney-general of the State of Maryland has collected and presented to us, in argument, numerous instances,[1]

---

[1] The following are the acts, and the subjects in reference to which they were passed: — *New Hampshire:* Casks of flaxseed, 1785.  See Perpetual Laws of New Hampshire, 1789, p. 193.  Dimensions of shingles, staves, and hoops.  Id., p. 188. *Massachusetts:* Shingles, staves, and hoops.  Acts and Resolves of the Province of Mass. Bay, vol. iii. [1742–1756], p. 128 *et seq.*, c. 22.  Size of casks for pickled fish.  Id., p. 1000, act of 1757.  *Rhode Island:* Regulating the inspection of beef, pork, pickled fish, and tobacco, and ascertaining the assize of casks, clapboards, shingles, boards, &c.  Public Laws of Rhode Island and Providence Plantations, ed. 1798, pp. 509, 512, 522.  *Connecticut:* Statutes of Conn., ed. 1786. For ascertaining the assize of casks used for liquor, beef, pork, and fish, pp. 18, 312.  There were sworn packers of tobacco, whose duty it was to brand casks. *New York:* Laws, ed. 1789.  All flour for exportation to be packed in casks of a certain size and make.  No flour to be exported without having been inspected. 1785, c. 35, p. 197.  No pot or pearl ashes to be exported before inspection. *New Jersey:* Capacity of meat barrels.  Act of April 6, 1676.  Leaming and Spicer, p. 116.  Capacity of barrels, id., p. 120; bricks, id., p. 459; barrels, id. 508.  Assize of bread, id. 545, 546, 547.  Size of casks.  Act of 1725.  Staves, hoops, shingles, &c.  Act of Sept. 26, 1772.  Size of casks.  Act of Sept. 26, 1772. *Pennsylvania:* Laws of Penn., A. J. Dallas, 1797.  Dimensions of casks for beer, ale, pork, beef, &c.  Id., p. 27 *et seq.*  Dimensions of staves, headings, boards, and

showing, by the text of the inspection laws of the thirteen American colonies and States, in force in 1787, when the Constitution of the United States was adopted, that the form, capacity, dimensions, and weight of packages were objects of inspection irrespective of the quality of the contents of the packages. The instances embrace, among others, the dimensions of shingles, staves, and hoops; the size of casks and barrels for fish, pork, beef, pitch, tar, and turpentine; and the size of hogsheads of tobacco. In Maryland, the dimensions of tobacco hogsheads were fixed by various statutes passed from the year 1658 to the year 1763. By the act of 1763, c. 18, sect. 18, it was enacted that all tobacco packed in hogsheads exceeding forty-eight inches in the length of the stave, and seventy inches in the whole diameters within the staves, at the croze and bulge, should be accounted unlawful tobacco and should not be passed or received. Like provisions fixing the dimensions of hogsheads of tobacco have been in force in Maryland from 1789 till now. In view of such legislation existing at the time the Constitution of the United States was adopted and ratified by the original States, known to the framers of the Constitution who came from the various States, and

timber. Id., p. 380. Flour casks, how to be made, and dimensions of. Id., p. 452, Act of 1781, c. 201. *Maryland:* Gauge of barrels for pork, beef, pitch, tar, turpentine, and tare of barrels for flour or bread, 1745, c. 15. Flour barrels, 1771, c. 20; 1781, c. 12. Staves and headings, 1745, c. 15; 1771, c. 20; 1786, c. 17. Salted provisions, 1745, c. 15; 1786, c. 17. Hay and straw, 1771, c. 20. Flour, 1781, c. 12. Fish, 1786, c. 17. Liquor casks, 1774, c. 23; 1777, c. 17; 1784, c. 83; 1785, c. 87. Many other Maryland provincial laws, prescribing the length, superficial and solid measure, weight and capacity, of domestic products, are collected on pages 45–47 of the report of Mr. J. H. Alexander on the Standards of Weight and Measurement in Maryland. *Virginia:* Laws of Va. Revisal, 1783, pp. 47, 188, 192. Pork, &c., required to be packed in barrels, before exportation. As to contents, quality, and stamps of barrels of pork, beef, pitch, tar, and turpentine, see id., p. 47, act of 1776, c. 43. Inspection of tobacco, and size of tobacco hogsheads. Act of 1783, c. 10, sects. 1, 15, 20. *North Carolina:* Iredell's Laws of N. C., ed. 1791. Dimensions of beef, pork, and fish casks, staves, and headings, and of boards, planks, and shingles. Act of 1784, c. 36. *South Carolina:* Grimke's Public Laws. Dimensions and capacity of beef and pork barrels, p. 209. *Georgia:* Watkins's Digest. Casks for beef and pork. Size of barrels for pitch, tar, and turpentine. Act of 1766, No. 140, amended by act of 1768, No. 179. In the legislation of the Province and State of Maryland, in reference to tobacco, the *dimensions,* or *gauge,* of *tobacco hogsheads* was fixed by the acts of 1658, c. 2; 1676, c. 9; 1694, c. 5; 1699, c. 4; 1704, c. 53; 1711, c. 5; 1715, c. 38; 1716, c. 8; 1717, c. 7; 1723, c. 25; 1747, c. 26; 1753, c. 22; 1763, c. 18; and 1789, c. 26.

called " inspection laws " in those States, it follows that the
Constitution, in speaking of " inspection laws," included such
laws, and intended to reserve to the States the power of con-
tinuing to pass such laws, even though to carry them out, and
make them effective, in preventing the exportation from the
State of the various commodities, unless the provisions of the
laws were observed, it became necessary to impose charges
which amounted to duties or imposts on exports to an extent
absolutely necessary to execute such laws.    The general sense
in which the power of the States in this respect has been un-
derstood since the adoption of the Constitution is shown by the
legislation of the States since that time, as collected in like
manner by the attorney-general of Maryland,[1] covering the

[1] *Pennsylvania:* Beef and pork intended for exportation, when packed or re-
packed, in Philadelphia: 1 Brightly's Purdon's Digest, 1873, pp. 157, 158; but-
ter and lard, id. 188, 189; domestic distilled spirits, id. 525; flaxseed, id. 708;
flour and meal, id. 711; *Delaware:* Size of casks for exportation of bread-
stuffs. Revised Statutes, 1874, p. 363.  *Virginia:* Tobacco, Code, 1873, pp. 739,
740; fish, id. 750; pitch, tar, turpentine, salt, staves, shingles, and lumber,
id. 751.  *Rhode Island:* Public Statutes, 1882; beef and pork casks, c. 3, p. 294;
lime casks, id. 298; fish casks, id., c. 114, p. 299.  *Maine:* Revised Statutes, 1871;
lime, c. 39, sect. 3; pot and pearl ashes, id., sect. 9; nails, id., sect. 17; fish,
id., c. 40, sects. 7, 8, and 11; cord-wood, id., c. 41, sect. 1; charcoal baskets, id.,
sect. 7; packed shingles, id., sect. 16; staves and hoops, id., sects. 18 and 19;
beef and pork barrels, id., c. 38, sects. 16 and 17.  *New Hampshire:* General Laws,
1878.  No salted beef to be exported except in tierces, barrels, or half-barrels
of particular quality, weight, and dimensions, and duly branded; c. 126, sects. 4
and 5; butter and lard casks, c. 127, p. 305; fish barrels, tierces, and casks,
c. 129, p. 310; casks of pot and pearl ashes, c. 130, p. 114.  *Massachusetts:* Gen-
eral Statutes, 1860; casks for pickled fish, c. 49, sect. 44; alewives, id., sect. 50;
staves, id., sect. 85; hogshead hoops, id., sect. 86; casks for pot and pearl
ashes, id., sect. 167; kegs for butter and lard, id., sect. 14.  *Connecticut:* Gen-
eral Statutes, 1875; fish barrels, p. 275, sect. 19.  *Vermont:* Revised Laws of
1880, p. 715; barrels of flour, weight, &c.  *New Jersey:* Revision, 1877; beef
and pork barrels, flour and meal casks, id. 437; herring casks, id. 478.  *Geor-
gia:* Code, 1867; flour barrels, sect. 1562; turpentine barrels, id., sect. 1573.
*Louisiana:* Digest of Statutes, vol. ii. 1870; beef and pork barrels, p. 38, sect.
28.  *Wisconsin:* Statutes of; fish casks, p. 856, sect. 22.  *Michigan:* Compiled
Laws, 1871, vol. i. pp. 474–485; size and weight of beef, pork, and fish barrels;
butter and lard barrels; flour and meal casks; pot and pearl ash casks.
*South Carolina:* General Statutes; flour barrels, p. 275; beef barrels, id. 279;
staves and shingles, id. 280.  *North Carolina:* Battle's Revisal; flour barrels,
c. 61, sect. 34, p. 496; beef or pork casks, id., sect. 50, p. 499; fish barrels, id.,
sect. 53, p. 499; turpentine, tar, and pitch barrels, id., sect. 54, p. 500.  *Tennes-
see:* Statutes, 1871; butter or lard casks, sect. 1832; flour barrels, sect. 1834.
*Florida:* Digest of Laws, 1881, p. 579; sizes of tar and turpentine barrels.

form, capacity, dimensions, and weight of packages containing articles grown or produced in a State, and intended for exportation. These laws are none the less inspection laws because, as was said by this court in *Gibbons* v. *Ogden*, they "may have a remote and considerable influence on commerce." It is a circumstance of weight that the laws referred to in the Constitution are by it made "subject to the revision and control of the Congress." Congress may, therefore, interpose, if at any time any statute, under the guise of an inspection law, goes beyond the limit prescribed by the Constitution, in imposing duties or imposts on imports or exports. These and kindred laws of Maryland have been in force for a long term of years, and there has been no such interposition.

Objection is made that the Maryland laws are not inspection

*Mississippi :* flour and pork barrels; Rev. Code, 1880, sect. 949, p. 280. *Ohio :* Revised Statutes, 1880, vol. i.; hogsheads of tobacco, p. 264, sect. 391; fish barrels, id., sect. 4300; spirit barrels, sect. 4327; oil barrels, sect. 4293; pot and pearl ash barrels, sect. 4291; beef or pork barrels, sect. 4285; flour and meal barrels, sect. 4281.

The legislation of Maryland, since 1787, affords the following instances : Pot and pearl ashes, intended for exportation from Baltimore, or Georgetown, in Montgomery County, were required to be packed in a particular manner in casks, and to be inspected and weighed. 1792, c. 65. A similar provision was made to prevent the exportation of unmerchantable flour and unsound salted provisions from Havre de Grace, by the act of 1796, c. 21; and from Chester, by the act of 1797, c. 7. By the act of 1781, c. 12, provision was made to prevent the exportation of bread and flour which were not merchantable, from the town of Havre de Grace. This act was enacted for a limited time only, and expired. It was revived and enacted into a permanent law by the act of 1801, c. 102, sect. 2, and is set forth in a note to the section last referred to, in the acts of 1801. By sect. 6 of the act of 1801, c. 102, the size of all flour casks brought to Baltimore Town for exportation, the character of the materials and make, the manner of hooping and nailing such hoops, the particular length of the staves, the diameter of the casks at the heads, and the number of pounds of flour to be in each cask, are specifically prescribed. The size of laths, and the mode of packing them, was regulated by the act of 1811, c. 69. The number and character of hoops upon casks of ground black-oak bark, exported from the port of Baltimore, was prescribed by the act of 1821, c. 77. The gross weight of a hogshead of tobacco, as well as its net weight, was required to be marked on the hogshead by the act of 1789, c. 26, sect. 21. The dimensions of the hogsheads in which tobacco was required to be packed was prescribed by sect. 35 of the act last cited. Further illustration may be found in the following legislation : Weighing wheat, 1858, c. 256, sect. 5; *Frazier v Warfield*, 13 Md. 300–304; fish barrels and tierces, Public Local Laws, art. 4, sect. 309; flour, id., sect. 352; domestic distilled liquors, id., sect. 360; flour barrels, 1 Md. Code, art. 96, sect. 20.

laws, but are regulations of commerce, because they require every hogshead of tobacco to be brought to a State tobacco warehouse.   But we are of opinion that, it being lawful to require the article to be subjected to the prescribed examination by a public officer before it can be accounted a lawful subject of commerce, it is not foreign to the character of an inspection law to require that the article shall be brought to the officer instead of sending the officer to the article.   It is a matter as to which the State has a reasonable discretion, and we are unable to see that such discretion has been exercised in any such manner as to carry the statutes beyond the scope of inspection laws.

There is another view of the subject which has great force. Recognized elements of inspection laws have always been quality of the article, form, capacity, dimensions, and weight of package, mode of putting up, and marking and branding of various kinds, all these matters being supervised by a public officer having authority to pass or not pass the article as lawful merchandise, as it did or did not answer the prescribed requirements.   It has never been regarded as necessary, and it is manifestly not necessary, that all of these elements should coexist in order to make a valid inspection law.   Quality alone may be the subject of inspection, without other requirement, or the inspection may be made to extend to all of the above matters.   When all are prescribed, and then inspection as to quality is dropped out, leaving the rest in force, it cannot be said to be a necessary legal conclusion that the law has ceased to be an inspection law.

As is suggested in *Neilson* v. *Garza*, 2 Woods, 287, by Mr. Justice Bradley, it may be doubtful whether it is not exclusively the province of Congress, and not at all that of a court, to decide whether a charge or duty, under an inspection law, is or is not excessive.   There is nothing in the record from which it can be inferred that the State of Maryland intended to make its tobacco-inspection laws a mere cover for laying revenue duties upon exports.   The case is not like that of *Jackson Mining Co.* v. *Auditor-General*, 32 Mich. 488, where a State tax imposed on mineral ore exported from the State before being smelted was held to be a tax on inter-state commerce, no such

tax being imposed on like ore reduced within the State. The question of the right of Maryland, under the Constitution of the United States, to require that the dimensions and gross weight of a hogshead containing tobacco grown upon its soil shall be ascertained by its officers before the tobacco shall be exported, is a question of law, because the question is as to whether such law is an inspection law. Moreover, the question as to whether the charges for such examination and its attendant duties are " absolutely necessary," was not before the State court, and was not passed upon by it, and cannot be considered by this court.

It is urged, however, that the Maryland law is a regulation of commerce and unconstitutional, because it discriminates between the State buyer and manufacturer of leaf tobacco and the purchaser who buys for the purpose of transporting the tobacco to another State or to a foreign country. But the State, having the right to prescribe the form, dimensions, and capacity of the packages in which its products shall be encased before they are brought to, or sold in, the public market, has enacted that no tobacco of the growth of the State shall be passed or accounted lawful tobacco unless it be packed in hogsheads of a specified size. Laws of 1872, c. 36, sect. 26. This regulation covers all tobacco grown in the State and packed in hogsheads, without reference to the purpose for which it is packed. If the tobacco is to be dealt in within the limits of the State, the examination as to dimensions is properly left to the contracting parties, probably under the view that the seller for the home market will have a sufficient stimulus to observe the requirement of the law, in a desire to maintain the reputation of his commodity. But, if the tobacco is to be exported as lawful tobacco, the State may, with equal propriety, prescribe and enforce an examination by an officer, within the State, of a hogshead containing tobacco grown in the State, and intended for shipment beyond the limits of the State, in order to ascertain, before the hogshead is carried out of the State, and before it becomes an article of commerce, that it is of the dimensions prescribed as necessary to make it lawful tobacco. In *Cooley* v. *The Board of Wardens*, 12 How. 299, a law of Pennsylvania provided that a vessel not taking a pilot

should pay half pilotage, but that this should not apply to American vessels engaged in the Pennsylvania coal trade. It was held that the general regulation as to half pilotage was proper, and that the exemption was a fair exercise of legislative discretion acting upon the subject of the regulation of the pilotage of the port of Philadelphia. The court said that, in making pilotage regulations, the legislative discretion had been constantly exercised, in this and other countries, in making discriminations, founded on differences both in the character of the trade and in the tonnage of vessels engaged therein. Any discrimination appearing in the present case is of the same character as that in the pilotage case, and fairly within the discretion of the State. Such discretion reasonably extends to exempting from opening for internal inspection an article grown in the State, when it is marked with the name of an ascertained owner, and to requiring that an article grown in the State shall be opened for internal inspection when it is not intended to be put on the market on the credit of an ascertained owner, and is not identified by marks as owned by him. So, too, in the exercise of the same discretion, and of its power to prescribe the method in which its products shall be fitted for exportation, it may direct that a certain product, while it remains " in the bosom of the country " and before it has become an article " of foreign commerce or of commerce between the States," shall be encased in such a package as appears best fitted to secure the safety of the package and to identify its contents as the growth of the State, and may direct that the weight of the package, and the name of the owner of its contents, shall be plainly marked on the package, and may also exempt the contents from inspection as to quality, when the weight of the package and the name of the owner are duly ascertained to be marked thereon. Such a law is an inspection law, and may be executed by imposing a " tax or duty of inspection," which tax, so far as it acts upon articles for exportation, is an exception to the prohibition on the States against laying duties on exports, the exception being made because the tax would otherwise be within the prohibition. *Brown* v. *State of Maryland*, 12 Wheat. 419, 438. At the same time we fully recognize the principle, that any inspection law is subject

to the paramount right of Congress to regulate commerce with foreign nations and among the several States.

The general provision of the Maryland statute is, that it shall not be lawful to carry out of the State, in hogsheads, any tobacco raised in the State, except in hogsheads which shall have been inspected, passed, and marked agreeably to the provisions of the act. These provisions include the doing of many things in addition to an inspection of quality. If the tobacco is grown in the State, and packed in the county or neighborhood where grown, it may be carried out of the State without having its quality inspected, if it be marked in the manner prescribed. But it still is necessary it should be inspected in all other particulars, and inspected also to ascertain that it was grown in the State and packed where grown, and is marked as required. If it does not answer the latter requirements it is to be further inspected as to quality. The necessity thus existing for subjecting the hogshead to inspection under all circumstances, a charge of some kind was proper for outage, that is, a charge payable, on withdrawing the hogshead, for labor connected with receiving and handling it and doing the other things above mentioned. Such charge appears to be a charge for services properly rendered.

The above views cover the objection made that the Maryland law discriminates between different classes of exporters of tobacco, and favors the person who packs it for exportation in the county or neighborhood where it is grown, as against other exporters. Whatever discrimination in this respect or in respect of purchases for exportation, before referred to, results from any provisions of the law, is a discrimination which, we think, the State has a right to make, resulting, as it does, wholly from regulations which affect the article before it has become an article of commerce, and which attach to it as and when it is grown, and before it is packed or sold. The tobacco is grown with these regulations in force, and the State has a right to say what shall be lawful merchantable tobacco. This is really all that has been done in regard to the tobacco in question.

In this case no inspection is involved except that of tobacco grown in Maryland, and we must not be understood as express-

ing any opinion as to any provisions of the Maryland laws which refer to the inspection of tobacco grown out of Maryland.

*Judgment affirmed.*