DICKERSON et al. v. NEW JERSEY STATE DEPARTMENT OF WEIGHTS AND MEASURES et al.

District Court, D. New Jersey.

May 15, 1940.

Samuel Morris, of Atlantic City, N. J., for plaintiffs.

David T. Wilentz, Atty. Gen., by Harry A. Walsh, Legal Asst. Atty. Gen., for defendants.

Before CLARK, Circuit Judge, and AVIS and FORMAN, District Judges.

AVIS, District Judge.

The complaint in this action is filed by plaintiffs, six New Jersey coal truckers and one Pennsylvania coal dealer, who are engaged in the business of transporting coal by motor truck from Pennsylvania to customers in New Jersey. They allege that certain laws of the State of New Jersey, which deny the use of the highways of the State to trucks transporting such coal unless accompanied by certificates of origin issued by the New Jersey Department of Weights and Measures to the approved mines or other source of supply in Pennsylvania, &c., and imposing penalties for violation, contravene the commerce clause of the United States Constitution, article 1, §

8, cl. 3, and they pray that enforcement of these statutes should be enjoined.

After the filing of the complaint a Three Judge Court was convened, in accordance with the provisions of the statute, 28 U.S. C.A. § 380. At the time of hearing on the application for interlocutory injunction, affidavits and proofs were presented, and counsel for both parties agreed that the Court should consider the case as being submitted on final hearing.

The Act in question is found in Revised Statutes of New Jersey, 1937, 51:7–1 et seq., as amended by Chapter 242 of the Laws of 1938, N.J.S.A. 51:7–1 et seq. The material parts are as follows:

"It shall be unlawful for any person to transport over the highways of this State any anthracite brought into this State by motor vehicle from outside of this State unless such anthracite when it crosses any boundary line of this State and at all times thereafter during the transportation thereof over the highways of this State is accompanied by an original certificate of origin signed by the person who is the owner or operator of the breaker, colliery, yard or other place of production or storage, or his duly authorized agent, where the anthracite to which the certificate of origin refers was produced or stored and also signed by the person driving or operating the motor vehicle on which said anthracite is transported into this State.

"The certificates of origin as herein provided shall be issued only on forms to be supplied, on application therefor, by the superintendent of the department, shall be serially numbered and issued consecutively. A nominal charge to cover the cost of supplying such forms may be made by the superintendent. Said certificates of origin shall be nontransferable and any person who has in his possession or who files with a weighmaster or forwards to the superintendent a false certificate of origin shall be deemed guilty of a violation of this chapter.

"The superintendent of the department shall issue such blank certificates of origin to any person who is the owner or operator of a colliery, breaker or other place of production or who is the owner or operator of a yard, pocket or other place of storage, outside the State of New Jersey, upon application therefor by such person showing the necessity for the issuance of said certificates and upon proof satisfactory to the

superintendent that all anthracite produced or stored is not stolen and is legally acquired at its source. Notification shall promptly be given to the superintendent in case of change of source or the obtaining of anthracite from new sources since the time said application is made, and satisfactory proof shall be furnished that the anthracite is legally acquired at the new sources.

"Whenever any person who transports or intends to transport anthracite into this State furnishes proof satisfactory to the superintendent that all anthracite so transported or to be transported is legally acquired at its source and is not stolen, and further, that such person is unable to obtain certificates of origin at the breaker, colliery or other place of production or at the yard, pocket or other place of storage, blank certificates shall be issued to such person in such number as the business of such person requires."

N.J.Stat.Service, 1938 Annual, 51:7–2 and 51:7–4, N.J.S.A. 51:7–2, 51:7–4.

Under the 1937 law the penalty was as follows: "Any person who violates any of the provisions of this chapter shall upon being found guilty of such offense pay a fine of not less than one hundred dollars nor more than five hundred dollars or if unable to pay such fine shall be committed to a county jail for a period not to exceed ninety days." Revised Stats. of N. J., 1937, 51:7–8, N.J.S.A. 51:7–8.

As we view it, the effect of these statutes is to bar the transportation of stolen anthracite in interstate commerce on the highways of New Jersey, and the question of whether it has been stolen is to be determined by the Department of Weights and Measures of the State of New Jersey.

Whether the coal transported by these plaintiffs was theretofore stolen, we do not know. The record is devoid of any suggestion that Pennsylvania has adopted any law preventing the sale of any of the coal so purchased or the transportation thereof over its highways, and the Federal government has not adopted any law banning or regulating the transportation thereof in interstate commerce.

Plaintiffs submit that the Act in question is a burden upon interstate commerce; that it is violative of the Fourteenth Amendment in that it is an unreasonable, arbitrary and capricious interference of their rights to use the highways of the State, and that the charge of four cents for each certificate is an unlawful duty or impost on interstate commerce, but the arguments reduced the issues to the following question: Under the established law may the State of New Jersey through its agencies determine that certain coal is stolen in Pennsylvania, and may it as it affects the interstate transportation of merchandise impose penalties for carting over its highways what it has determined in a summary manner is stolen coal?

It should be observed that the certificates are issuable at the source of the anthracite upon proof of legality, &c., or in the alternative to the truck driver who is unable to procure such certificates at the source, but who makes proof of legality, &c.

Under the 1937 Act certificates were issued perfunctorily without proof of conditions specified in the amendatory act. One of the plaintiffs, Joseph Dickerson, having acquired a number of these certificates was admonished in June 1939 by an inspector of the New Jersey State Department of Weights and Measures, an agent of defendant, to cease and desist using such blanks and procure certificates pursuant to the amendatory act, or suffer a revocation of his license to transport solid fuel within New Jersey, together with fine or imprisonment pursuant to the terms of the Act.

Defendant argues that the statute is within the sphere of regulation reserved to the States under their police powers, and that it is a reasonable effort to prevent frauds attendant upon the influx of stolen goods. Defendant also presents a correlative argument deduced from the asserted premise that the statute is valid as an inspection law. In support thereof cases were offered sustaining state supervision of the weighing of articles of interstate commerce, Pittsburgh &c. Coal Co. v. Louisiana, 156 U.S. 590, 15 S.Ct. 459, 39 L.Ed. 544; accord, Hauge v. Chicago, 299 U.S. 387, 57 S.Ct. 241, 81 L.Ed. 297; similar supervision of the branding of the contents or quality of such goods, Savage v. Jones, 225 U.S. 501, 32 S.Ct. 715, 56 L.Ed. 1182; Patapsco Guano Co. v. Board of Agr. of North Carolina, 171 U.S. 345, 18 S.Ct. 862, 43 L.Ed. 191, and cases sustaining State barriers to the importation of diseased cattle, Mintz v. Baldwin, 289 U.S. 346, 53 S.Ct. 611, 77 L.Ed. 1245; Reid v. Colorado, 187 U.S. 137, 23 S.Ct. 92, 47 L.Ed. 108.

From the above authorities defendant concludes that it follows that the State of New Jersey may control and prohibit the infiltration of stolen anthracite. The underlying theories supporting inspection laws and laws designed to prevent the dissemination of disease within a State, in which categories the above citations fall, were set forth in the case of Bowman v. Chicago &c. Railway Co., 125 U.S. 465, 8 S.Ct. 689, 1062, 31 L.Ed. 700. Therein the Supreme Court had before it for consideration a statute of the State of Iowa forbidding common carriers to bring intoxicating liquors into the State from any other State without being first furnished with a certificate under the seal of the auditor of the county to which it was to be transported, stating that the recipient was authorized to sell intoxicating liquors. The court stated:

"It is impossible to justify this statute of Iowa by classifying it as an inspection law. The right of the states to pass inspection laws is expressly recognized in article 1, § 10, Const., in the clause declaring that 'no state shall, without the consent of congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws.' * * * 'And all such laws shall be subject to the revision and control of the congress.' The nature and character of the inspection laws of the states, contemplated by this provision of the constitution, were very fully exhibited in the case of Turner v. Maryland, 107 U.S. 38, 2 S.Ct. 44 [27 L.Ed. 370]. 'The object of inspection laws,' said Chief Justice Marshall in Gibbons v. Ogden, 9 Wheat. 1, 203 [6 L.Ed. 23], 'is to improve the quality of articles produced by the labor of a country; to fit them for exportation, or, it may be, for domestic use. They act upon the subject, before it becomes an article of foreign commerce, or of commerce among the states, and prepare it for that purpose.' They are confined to such particulars as, in the estimation of the legislature and according to the customs of trade, are deemed necessary to fit the inspected article for the market, by giving to the purchaser public assurance that the article is in that condition, and of that quality, which makes it merchantable and fit for use or consumption. They are not founded on the idea that the things in respect to which inspection is required, are dangerous or noxious in themselves. As was said in Turner v. Maryland, 107 U.S. 38, 55, 2 S.Ct. 44, 58 [27 L.Ed. 370]: 'Recognized elements of inspection laws have always been—quality of the article, form, capacity, dimensions, and weight of package, mode of putting up, and marking and branding of various kinds—all these matters being supervised by a public officer having authority to pass or not pass the article as lawful merchandise, as it did or did not answer the prescribed requirements. It has never been regarded as necessary, and it is manifestly not necessary, that all of these elements should co-exist in order to make a valid inspection law. Quality alone may be the subject of inspection, without other requirement, or the inspection may be made to extend to all of the above matters.' It has never been regarded as within the legitimate scope of inspection laws to forbid trade in respect to any known article of commerce, irrespective of its condition and quality, merely on account of its intrinsic nature and the injurious consequences of its use or abuse.

"For similar reasons the statute of Iowa under consideration cannot be regarded as a regulation of quarantine, or a sanitary provision for the purpose of protecting the physical health of the community, or a law to prevent the introduction into the state of disease, contagious, infectious, or otherwise. Doubtless the states have power to provide by law suitable measures to prevent the introduction into the states of articles of trade, which, on account of their existing condition, would bring in and spread disease, pestilence, and death, such as rags or other substances infected with the germs of yellow fever or the virus of small-pox, or cattle or meat or other provisions that are diseased or decayed, or otherwise, from their condition and quality, unfit for human use or consumption. Such articles are not merchantable; they are not legitimate subjects of trade and commerce. They may be rightly outlawed as intrinsically and directly the immediate sources and causes of destruction to human health and life. The self-protecting power of each state, therefore, may be rightfully exerted against their introduction, and such exercises of power cannot be considered regulations of commerce prohibited by the constitution."

125 U.S. 488, 489, 8 S.Ct. 700, 31 L.Ed. 700.

As in the case just cited, and for the reasons pointed out therein, we must conclude

that the cases offered with reference to inspection measures and acts designed to prevent the dissemination of disease within a State are inapplicable.

At the oral argument defendant relied strongly upon the case of New Mexico ex rel. McLean v. Denver & Rio Grande R. R. Co., 203 U.S. 38, 27 S.Ct. 1, 51 L.Ed. 78. The statute of New Mexico under consideration in that case prohibited any person, including common carriers, from receiving for the purpose of shipment outside the territory any hides that had not been inspected and tagged by a State inspector of the district where the hides originated. The court held this statute was a valid exercise of the police power designed to protect residents of the territory from fraud and criminal seizures of their property. It is apparent, however, that this case does not stand for the proposition that the statute herein is proper. At most, it only stands for the proposition that the Commonwealth of Pennsylvania may protect its residents from unlawful confiscation of their property. The limitations upon Pennsylvania's power to act are not involved herein.

The only cases dealing with State legislation designed to prevent the importation of stolen coal, which have been offered, are those of People v. Rueffer, 279 N.Y. 389, 18 N.E.2d 633 and Rueffer v. Department of Agriculture & Markets, 279 N.Y. 16, 17 N.E.2d 407. The only bearing these cases have on the constitutionality of the statute in issue is a dictum in the first of these cases to the following effect: "If the Legislature was informed of the practice of transporting 'bootleg' or stolen coal from Pennsylvania to New York, surely the circumstances are such as to support an exercise of the police power. The fact that interstate commerce may be indirectly or incidentally involved does not deprive a State of that right." 18 N.E.2d 634.

We think the State of New Jersey is powerless to control the shipment of stolen anthracite in interstate commerce, even though the purpose of the Act was to prevent the perpetration of frauds upon residents of New Jersey. Relief in this respect must come from Congress under its power to regulate interstate commerce, or possibly the State from which the coal has come. That Congress can make the regulation is demonstrated in the cases of Di Santo v. Pennsylvania, 273 U.S. 34, 47 S. Ct. 267, 71 L.Ed. 524; Shafer v. Farmers' Grain Co., 268 U.S. 189, 45 S.Ct. 481, 69 L. Ed. 909; Lemke v. Farmers' Grain Co., 258 U.S. 50, 42 S.Ct. 244, 66 L.Ed. 458; and Crutcher v. Kentucky, 141 U.S. 47, 11 S.Ct. 851, 35 L.Ed. 649.

In the case of Di Santo v. Pennsylvania, supra, the State of Pennsylvania required persons, other than railroad or steamship companies, who engaged within the State in the sale of steamship tickets or orders for transportation to or from foreign countries, to procure licenses, by giving proof of moral character, paying a fee of $50 and filing a bond as security against fraud or misrepresentation to purchasers. This statute was designed as the statute at bar to protect citizens of the State from fraud. Of this the court stated: "Such legislation cannot be sustained as an exertion of the police power of the state to prevent possible fraud. Real Silk Mills v. Portland, 268 U.S. 325, 336, 45 S.Ct. 525, 69 L.Ed. 982. The Congress has complete and paramount authority to regulate foreign commerce and, by appropriate measures, to protect the public against the frauds of those who sell these tickets and orders." 273 U.S. 37, 47 S.Ct. 268, 71 L.Ed. 524.

The cases of Shafer v. Farmers' Grain Co., supra, and Lemke v. Farmers' Grain Co., supra, involved the regulation of the sale and distribution of wheat, &c., in North Dakota, supervised by licensed inspectors of the State. The statute in both cases was held to be an unwarranted burden upon interstate commerce. In the first of these cases the court stated: "The defendants make the contention that we should assume the existence of evils justifying the people of the state in adopting the act. The answer is that there can be no justification for the exercise of a power that is not possessed. If the evils suggested are real, the power of correction does not rest with North Dakota but with Congress, where the Constitution intends that it shall be exercised with impartial regard for the interests of the people of all the states that are affected." 268 U.S. 202, 45 S.Ct. 486, 69 L.Ed. 909.

In the second of the above cases the court observed: "It is alleged that such legislation is in the interest of the grain growers and essential to protect them from fraudulent purchases, and to secure payment to them of fair prices for the grain actually sold. This may be true, but Congress is amply authorized to pass measures to protect interstate commerce if legislation of that character is needed. The supposed

inconveniences and wrongs are not to be redressed by sustaining the constitutionality of laws which clearly encroach upon the field of interstate commerce placed by the Constitution under federal control." 258 U.S. 60, 61, 42 S.Ct. 248, 66 L.Ed. 458.

An injunction against the enforcement of the statute complained of will issue.